IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ELMER LAMONT CHAVIS, | ) | |
| a.k.a. OMAR CHAVIS, #245609, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:09-CV-574-WKW |
| | ) | [WO] |
| | ) | |
| DAVID WISE, et al., | ) | |
| | ) | |
| Respondents. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION AND PROCEDURAL HISTORY

This cause is before the court on a 28 U.S.C. § 2254 petition for writ of habeas

corpus filed by Elmer Lamont Chavis ["Chavis"], a state inmate, on March 23, 2009.[1]  In

this petition, Chavis challenges three convictions for first degree rape imposed upon him

by the Circuit Court of Houston County, Alabama on January 25, 2006.[2]  The trial court

---

[1] The law is well settled that a pro se inmate's petition is deemed filed the date it is delivered to prison officials for mailing.  *Houston v. Lack*, 487 U.S. 266, 271-272 (1988); *Adams v. United States*, 173 F.3d 1339, 1340-41 (11th Cir. 1999); *Garvey v. Vaughn*, 993 F.2d 776, 780 (11th Cir. 1993).  Chavis certified that he placed the petition in the prison mailing system on March 23, 2009.  *Petition for Writ of Habeas Corpus Relief - Court Doc. No. 1* at 13.  In light of the foregoing and for purposes of the proceedings herein, the court considers March 23, 2009 as the date of filing.

[2] In April of 2004, a Houston County Grand Jury issued indictments against Chavis for three counts of first degree rape of his step-daughter in violation of *Ala. Code* § 13A-6-61(a)(1).  *Respondents' Exhibit 5 - Doc. No. 16-5* at 10; *Respondents' Exhibit 12 (Chavis' Rule 32 Petition) - Doc. No. 16-12* at 17.  Specifically, each indictment charged that Chavis engaged in sexual intercourse with the victim by forcible compulsion.  Under *Ala. Code* § 13A-6-61(a)(1), "A male commits the crime of rape in the first degree if ... [h]e engages in sexual intercourse with a female by forcible compulsion[.]" *Id.*  "Sexual intercourse" is defined as having "its ordinary meaning and occurs upon any penetration, however slight; emission is not required."  *Ala. Code* § 13A-6-60(1).  State law is well settled that:

sentenced Chavis as a habitual felony offender to life imprisonment for each conviction, with the sentences to run consecutively.

After a suppression hearing on the admissibility of a tape recording of a controlled telephone call between the victim and Chavis on the day of his arrest, the trial court denied the motion to suppress and deemed the evidence admissible. *Respondents' Exhibit B (Part I) - Court Doc. No. 35-2* at 5-20 (Trial Transcript at 6-21). During the trial of this case, the State presented evidence that Chavis raped the victim on numerous occasions over the course of several years at their residence in Dothan, Alabama. The victim testified, in pertinent part, as follows:

> Q. Okay. Now, back in February of 2004, you attended Dothan High School; is that right?
>
> A. Yes.

---

A conviction for rape may be based solely on the victim's uncorroborated testimony. *Smith v. State,* 604 So.2d 434, 436 (Ala.Cr.App.1992). Whether there is "actual penetration" is a question for the jury. *Seales v. State,* 581 So.2d 1192, 1193-94 (Ala.1991). Furthermore, "penetration can be established by circumstantial evidence and 'does not have to be proved by use of any particular words.'" *Swain v. State,* 629 So.2d 699, 700-01 (Ala.1993), quoting *Patrick v. State,* 495 So.2d 112, 115 (Ala.Cr.App.1986).

*Boyd v. State*, 699 so.2d 967, 970 (Ala.Cr.App. 1997). "Whether semen was found ... is immaterial because ejaculation is not an element of rape." *Greathouse v. State*, 650 So.2d 599, 602-603 (Ala.Cr.App. 1994); *Smith v. State*, 601 So.2d 201, 205 (Ala.Cr.App. 1992) ("[T]he lack of a finding of semen is irrelevant, in a prosecution for rape, because sexual intercourse ... occurs upon any penetration of the vagina, however slight, and emission is not required."). "The force necessary to be used, to constitute the crime of rape, need not be actual, but may be constructive or implied. An acquiescence to the act obtained through duress, or fear of personal violence, is constructive force, and the consummation of unlawful intercourse by th man thus obtained would be rape." *Shepherd v. State*, 33 So. 266, 267 (Ala. 1903); *Greathouse*, 650 So.2d at 603 ("The element of forcible compulsion may be found in cases where an implied threat serves as motivation for the victim to engage in sexual intercourse. *Smith v. State*, 601 So.2d at 204. A victim's fear that she could be beaten if she refused to have intercourse satisfies the forcible compulsion element of first degree rape.").

* * *

Q.  Do you remember one day someone coming from an organization called the House of Ruth to your school?

A.  Yes.

Q.  And did you know at that time what the House of Ruth was?

A.  Kind of, sort of.

Q.  What did you think it was? Back then -- ....

A.  They said it was a place for like helping women.

* * *

Q.  Did they give you any kind of -- some paperwork or stuff to take home or questionnaires or stuff like that?

A.  Yeah.  They passed out a [questionnaire] we had a choice to fill out....

* * *

Q.  What did you do with your[] [questionnarie]?

A.  I filled mine out and kept mine.

* * *

Q. And do you know the defendant, Elmer Chavis, Elmer Lamont Chavis....?

A.  Yes.

Q.  How do you know him or recognize him?

A.  My stepfather.

* * *

Q.  Did he have another name that he went by at that time?

A.  Omar.

Q.   He lived with y'all in your home on Citadel Avenue [in Dothan, Alabama]?

A.  Yes.

Q.  How long had y'all lived in Dothan?  By the time you were 14 in [2004 at] Dothan High, freshman year, how long were you living there?

A.  It was about two years and a half.

* * *

Q.  Now, let's go back. And I want to ask you about this questionnaire that you brought [home].  Okay?  You brought it home to your house.  Right?

A.  Yeah.

Q.  And do you recall ... what you did with it when you went home?

A.  I put it up so it wouldn't be found.

Q.  Did you want anybody to see it at that time?

A.  No.

Q.  Were some of the questions asking you about had anybody touched you or subjected you to sexual contact or any kind of sexual assault or rape or things like that?

A.  Yes.

Q.  Did you want anybody to look at it at that time?

4

A.  No.

Q.  Were you afraid for somebody to see it?

A.  Yes.

Q.  Embarrassed by it, too?

A.  Yes.

* * *

Q.  Did your mom see it while you had it?

A.  Yeah.  She saw it in my hand when I was going to move it.

Q.  And where were you when she saw it in your hand?  Do you remember?

A.  We was in -- it was another room in our house, like at the other end of the house.  It was in another room, like a guest room.

Q.  Did she ask you about it?

A.  Yeah.

Q.  Did you want to show it to her?

A.  No.

Q.  Did you show it to her at first when she asked you about it?

A.  No.

Q.  Okay.  How did it come about that you showed it to her?

A.  I just told her that it was a little paper.  And she told me to give it to her.  So I gave it to her when she told me to.

Q.  And when she read it, I guess there was some upsetting stuff in there. Right?

A.  Yes.

Q.  Now, when she read that, what happened next?

A.  Well, she asked me was it true, and I said yes. And then she told me to wait and not to worry about it; she was going to handle things. And I didn't go to school that day. She took me to one of her friend's house. And she went on from there [and made arrangements for me to talk to officers at the Dothan Police Department].

* * *

Q.  Okay.  And did you go to ... [the] police department [later that day]?

A.  Yeah.

* * *

Q.  ... [D]id you talk with anybody there?

A.  Yes.  I talked to the police officer [and told him what was happening].

* * *

Q.  Now, I want to take you back to ... the night before you went to the police station [the night of February 9, 2004].  Okay?  In your home, did your dad or the man you called Dad, your stepfather, touch you in any way?

A.  Yes.

Q.  Can you tell the jury how he touched you?

A.  Well, he -- it started, he used to have anal sex with me.  But then it started to sex.

Q.  When you say anal sex, you mean he would put his private part in your bottom?

A.  Yes.

Q.  And did that hurt?

A.  Yes.

Q.  Where did that take place?

A.  Most of the time, it took place in my mom and his room.  But sometimes it took place in my room.

Q.  Then, later, did he do like vaginal sex and put his penis in your private part, your vagina?

A.  Yes.

Q.  And I know you know this, and you feel like you know it, but when I say penis and vagina, you what I'm talking about?

A.  Yes.

* * *

Q.  Now, that night before, the day before [your mom saw] the questionnaire and before you went to the police, had he had sex with you?

A.  Yeah.

Q.  Tell the jury what happened before he would have sex with you.

A.   He would tell me to give him some and whether it was go to their room or my room -- or he would come to my room.

Q.  What would happen when he would tell you to give him some?

7

A.  He would tell me to take my clothes off.

Q.  He would tell you to?

A.  Well, most of the time, he said, give me some.  I just knew I had to take off my clothes eventually.

Q.  What would you do when you took off your clothes?

A.  He would tell me to lay across the bed.

Q.  Would you do that?

A.  Yes.

Q.  Now, were you afraid of him in any way when you would do that?

A.  Yeah.

Q.  Why were you afraid of him?

A.  Because he was bigger than me.

Q.  Had he ever whipped your or threatened to whip you?

A.  Yeah.

Q.  Had he ever threatened to whip you if you did not have sex with him?

A.  Yeah.

Q.  Do you know how many times that happened?

A.  Not -- I mean, it didn't happen too many times, because one time, I just said, whoop me.  And I still got the same thing anyways.

Q.  Didn't get whipped too many times?

8

A.  No.

Q.  Did he ever threaten that he would whip you if you didn't have sex?

A.  Sometimes.

Q.  Did he ever give you a choice between a whipping and having sex?

A.  He did once, but it was a lie.

Q.  What happened?  Why do you say it was a lie?

A.  He whooped me, and then I still had sex with him anyways.

* * *

Q.  Now, I want to ask you, one of the incidents happened recently before you reported it and went to the police [on February 10, 2004]; is that right?

A.  Yes.

Q.  He had sex with you before?

A.  Yes.

Q.  When was the time immediately before that that he had sex with you?

A.  Probably like some time earlier in the week [of February 10, 2004].

* * *

Q.  Do you know how many times he would have had sex with you that week?

A.  No.

Q.  More than once?

9

A.  I mean, I really don't know, but I know it happened a lot.

Q.  More than three times [during the week preceding his arrest]?

A.  Yeah.

Q.  More than five times?

A.  I don't know.

* * *

Q.  Did he ever say what might happen if you told someone what he was doing to you?

A.  Well, at one point, ... I thought I was going to tell my mother.  But he told me if I told my mother, because she was away for a while, that if she tried to come back, they would put her in jail, because she was in the military.

Q.  Because she was in the military?

A.  (Witness nodded head in affirmative.)

Q.  And did you believe that?

A.  Yeah.

Q.  So you believed that if you mother found out, she was going to leave wherever she was and come home --

A.  Yeah.

Q.  -- without permission and go AWOL?

A.  Uh-huh.

Q.  Do you know what AWOL means?

A.  Yeah.  Now I do.

Q.  ...  But you were afraid of her leaving the Army and getting in trouble?

A.  Yes.

Q.  And that came from [Chavis]?

A.  Yes.

Q.  That possibility came from him.  Back in February of 2004, your mother was home.  Correct?

A.  Uh-huh.

Q.  And she had been in Afghanistan before February.  Right?

A.  Yes.  [She had come home from Afghanistan a few days before Christmas of 2003.]

* * *

Q.  All right.  I'll show you what we have marked as State's Exhibit No. 3....
Do you recognize this?

A.  Yes.

Q.  And what is this?

A.  That's the paper I filled out in class.

Q.  And it has like 10 questions on it and then a blank space at the bottom where you could write things. Correct?

A.  Yeah.

Q.  And you wrote things on this form.  For example, have you been sexually harassed or assaulted?  And you said yeah.  Correct?

11

A.  Yeah.

Q.  And then one question that was asked, was the offender an adult or other?  And you checked what?

A.  An adult.

Q.  Does the harassment occur two to four times per month or every few days, every day, once, once a month -- and which ones did you check?

A.  I checked two to four times per month, every few days and every day.

Q.  And every day?

A.  (Witness nodded head in affirmative.)

Q.  And then there is a form that says, if you were sexually assaulted, was the offender a peer, an adult -- and you checked what?

A.  An adult.  And the example was my stepfather.

Q.  It says, explain.  And you wrote stepfather?

A.  Yeah.

Q.  And then it says, how old were you when the assault occurred?  And you wrote a number there.  Correct?

A.  Yeah.

Q.  What did you write?

A.  I wrote 12.

Q.  And you say -- the tone of voice that you answered that indicates that you say -- you said you wrote that, but that's not exactly right. Right?

A.  Yes.

12

Q.  What's -- tell me about that.

A.  Well, the age was 11, because I remember I was in -- I was just starting sixth grade. And like, right now, I am 16 in the eleventh grade, and I graduate at 17.  So my age is behind what everybody else is.

Q.  So it would have been 11 really?

A.  Uh-huh.

Q.  And you say the offender of the assault was -- then, it says acquaintance, relative, stranger, boyfriend -- and you checked what?

A.  Relative.

Q.  And it says, describe relation -- and you checked what?

A.  Stepfather.

Q.  And it says, where did the assault occur?  And it says, school, car, other house, outside, your home -- you checked what?

A.  Your home.

* * *

Q.  Now, at the bottom, you wrote some things, also.  Correct?

A.  Yes.

Q.  And you wrote -- tell me if this is right. I hate Omar.  I wish I never even knew him. I hate the things that he does to me. I wish he would just go away. Did you write that?

A.  Yes.

Q.  And when you were writing about the things he does to [you], were you writing about the sex, having sex with [you]?

A.  Yes.

* * *

Q.  Now, also, Jalisa, you had a diary; is that correct?

A.  Yes.

Q.  And you gave your diary -- or turned it over to the police department when this investigation started; is that right?

A.  Yes.

* * *

Q.  And in your diary that you gave to the police, did you make notes periodically about what Omar, or your stepfather, had been doing to you?

A.  Yes.

Q.  Those notes in there, were they true and correct?

A.  Yes.

Q.  Were you honest about what he had done to you?

A.  Yes.

Q.  In fact, some of the things in there, you don't even mention or write out in detail about what he did to you?

A.  No.

Q.  This form [the questionnaire] that we are letting the jury see that you have testified about, when you wrote those things about Omar in there, were those things true?

A.  Yes.

14

Q.  Did you lie or make anything up in that form or in your diary about him to try to hurt him --

A.  No.

Q.  -- or try to put a lie on him --

A.  No.

Q.  -- and say that he did something he didn't do?

A.  No.

Q.  Were you telling the truth in your diary when you wrote those things?

A.  Yes.

Q.  In that form that the jury has, were you telling the truth in that form?

A.  Yes.

Q.  At your home on Citadel Avenue, the week before you reported it to the police [which would be the week beginning February 3, 2004], is it fair to say that it happened at least three times that week?

A.  Yeah.

Q.  And when I say "it", I mean having vaginal sexual intercourse with you, raping you, putting his penis in your vagina?

A.  Yes.

Q.  Prior to that week -- let's take the week -- let's say [the week prior] to February 3rd....  So  let's go back to February 3rd, 2004.  Okay?  And let's block that week out.  All right?  Going back from February 3rd backwards, do you know how many times he had sex with you?

A.  No.

15

Q.  Do you know -- can you count more than 10, more than 5? Can you count [all the times he had sex with you during the time prior to that week]?

A.  I couldn't count it all, but I know it was more than 10.

Q.  You know what?

A.  That it's more than 10.

* * *

*Respondents' Exhibit B (Part I) - Court Doc. No. 35-2* at 37-62 (Trial Transcript at 38-63).[3]

The State also entered into evidence a tape recording of a February 10, 2004 controlled telephone call between the victim and Chavis in which the victim advised Chavis she was pregnant and Chavis told the victim "you say it's by what's his name -- you say it's by what's his name when you say you're pregnant...." *Id*. at 67-68 (Trial Transcript at 68-69). On the tape, Chavis also advises the victim "you ain't got to worry about doing it again" which the victim testified that Chavis' reference to "it" meant "[h]aving sex with him." *Id*. at 68 (Trial Transcript at 69).

The certified sexual assault nurse who examined the victim upon her arrival at the hospital on February 10, 2004 testified that "[a]t the area of the posterior forchette, which is the area at about six o'clock at the entrance of the vaginal area, [the victim] had some white scar tissue that would indicate an injury there." *Respondents' Exhibit B (Part II) - Court Doc. No. 35-3* at 4 (Trial Transcript at 118).  The nurse also noted that the victim's

---

[3] The questionnaire and diary were admitted into evidence during the victim's testimony.

16

hymen "was not intact." *Id*. An officer with the Dothan Police Department testified that swabs obtained from the victim during a sexual assault examination, bedding, a cloth and a pair of the victim's panties had been procured during the investigation but the analysis report regarding these items had not been received from the Alabama Department of Forensic Sciences at the time of trial. *Id*. at 11-12 (Trial Transcript at 125-126).[4] Chavis testified in his own defense and denied any sexual contact with the victim. *Id*. at 47 (Trial Transcript at 161). Throughout his testimony, Chavis also presented potential motives the victim might have had for making the accusations against him. After hearing all of the testimony and reviewing the evidence submitted in the case, the jury found Chavis guilty of three counts of first degree rape.

Chavis filed a direct appeal of his rape convictions. In his appeal, Chavis argued that: (i) The tape of the controlled phone call and transcript thereof should have been suppressed because no person who testified at the suppression hearing had heard both sides of the conversation; (ii) The trial court erred when it denied Chavis' motion for judgment

---

[4]Chavis' trial began on January 24, 2006 and the jury returned its verdicts on January 25, 2006. The record indicates that on January 17, 2006 an analyst with the Alabama Department of Forensic Sciences complied a preliminary report of results from tests conducted on items provided to the department by law enforcement officials. This report of "Examination of Biological Evidence" indicated negative results for the presence of semen in "the vaginal swabs/smear, the rectal swabs/smear, and the oral swabs/smear ... the panties ... the cloth ... the comforter ... and the blanket...." *Respondents' Exhibit 4 - Doc. No. 16-44* at 33-35. Houston County law enforcement officials received the final report from the Department of Forensic Sciences on February 27, 2006. The record indicates that neither investigating law enforcement officials nor the prosecutor had knowledge of the test results contained in the report prior to February 27, 2006. As previously noted, *infra* at n. 2, Alabama law is well settled that "[w]hether semen was found ... is immaterial because ejaculation is not an element of rape." *Greathouse*, 650 So.2d at 602-603 (Ala.Cr.App. 1994); *Smith*, 601 So.2d at 205 ("The lack of finding of semen is irrelevant, in a prosecution for rape, because sexual intercourse ... occurs upon any penetration of the vagina, however slight, and emission is not required.").

of acquittal because the victim provided the only evidence of the offenses; (iii) The trial court erred in denying Chavis' motion for a new trial based on the State's failure to produce a lab report in the possession of the Alabama Department of Forensic Sciences absent a hearing on the veracity of the investigator's testimony that at the time of trial he had not yet received the report; and (iv) Trial counsel provided ineffective assistance because she was ill-prepared for the suppression hearing and failed to timely object to admission of the tape recording of the controlled conversation or the victim's diary. *Respondents' Exhibit 4 - Doc. No. 16-4* at 27.

On March 16, 2007, the Alabama Court of Criminal Appeals affirmed Chavis' convictions for first degree rape in an unpublished memorandum opinion. *Respondents' Exhibit 5 - Doc. No. 16-5.* The appellate court's opinion, in relevant part, reads as follows:

> The evidence adduced at trial tended to show the following.
>
> J.M.W. was a 14-year-old student at Dothan High School in February 2004. In one of her classes that school year, a representative from the House of Ruth, a shelter for battered women, came to the school and spoke. The representative passed out a survey for the students to look at and fill out, if they wished. J.M.W. filled out the survey, but she did not return it to the speaker. Instead, she took it home and hid it.
>
> The survey asked whether the student had ever been sexually harassed or assaulted. If the student answered yes, the survey asked for general details about the assault. For example, the form asked general questions regarding how often the respondent was assaulted, the location of the assault or assaults, and who committed the assaults. J.M.W. indicated that an adult male relative, specifically her stepfather, began sexually assaulting her when she was 12 years old and that the assaults took place frequently. She also

indicated that she had never reported the assaults to anyone. At the bottom of the survey, J.M.W. wrote that she hated her stepfather, known as "Omar," and that she wished she "never ever [k]new him. I hate the things he does to me. I wish he would just go away!"

In her diary, J.M.W. wrote, "My father makes me hate him, because I hate the things that he does to me."  She also wrote:

> "The first thing of this is, every time my father does something for me, I owe him something, and I don't mean something good. For example, like my birthday, if he did something good for me on my birthday, later on, he would say, you owe me. And I hate what I have to owe him. It's horrible. It's horrible."

On the morning of February 10, 2004, J.M.W. was holding the survey she had hidden in her room when her mother saw her and asked what was in her hand. J.M.W. testified that she did not want to show the survey to her mother, but when her mother insisted, J.M.W. gave her the paper. After looking at the paper, her mother asked J.M.W. if what she was reading was true. J.M.W. said that it was.

J.M.W. testified that her mother took her to a friend of her mother's instead of to school that morning. Her mother then spoke to the police, who said that J.M.W. would have to make a complaint with the police herself. J.M.W.'s mother's friend took J.M.W. to the Dothan police department, where J.M.W. spoke to Officer Stacey Robinson, a detective in the juvenile division.

At Officer Robinson's request, J.M.W. wrote a statement in which she outlined the sexual assaults Chavis had committed against her since she was 12 years old. According to J.M.W.'s statement, the assaults began with anal sex, but as the girl got older, Chavis began having intercourse with her. J.M.W. said that the assaults would happen when her mother, a member of the Alabama National Guard, was out of town for work and when she was deployed to Afghanistan.

J.M.W. also testified that Chavis had threatened to whip her if she did not have sex with him. She said one time, "I just said, 'whoop me.' And I

19

still got the same thing anyways."

Robinson had J.M.W. place a "controlled" call from the police department to Chavis and instructed her to tell Chavis she was pregnant. The call was taped. According to a transcript of the taped call, when J.M.W. told Chavis she was pregnant, the following conversation took place:

"J.M.W.: Well, do I tell Momma?

"CHAVIS: If you do you say by 'what's his name.' You hear me?

"J.M.W.: Yes.

"CHAVIS: You got to stand by that you hear me?

"J.M.W.: Yes.

"CHAVIS: You stand by that and you'll be all right. You hear me?

"J.M.W.: Uh huh.

"CHAVIS: You hear me?

"J.M.W.: Yes.

"CHAVIS: Who you gonna say it's by?

"J.M.W.: Uumm....

"CHAVIS: Whose phone you on?

"J.M.W.: Shardae's cell phone.

"CHAVIS: Don't tell nobody else and you ain't got to worry about doing it again. You hear me?

"J.M.W.: Okay.

"CHAVIS: You hear me? I'm telling you, no matter what you stand by that. (Unintelligible) . . . You hear me?

"J.M.W.: Okay.

"CHAVIS: I love you and you stand by me on this and I'll stand by you. Okay?

"J.M.W. Okay.

"CHAVIS: Okay, okay. I got you. You through?

"J.M.W.: Yeah.

"CHAVIS: Okay. All right. Bye.

"J.M.W.: Bye."

J.M.W. testified that she understood that when Chavis told her she "ain't got to worry about doing it again," he meant having sex with him. J.M.W.'s mother, Jazzma Chavis, testified that she was with Chavis when he spoke with J.M.W. on the telephone. She said that after the call, he did not tell her that J.M.W. said she was pregnant. She said he told her "it was just some problem with [J.M.W.] at school, that he [would] take care of it."

Within 30 minutes of the conversation, Dothan police arrested Chavis in a store parking lot. Jazzma Chavis testified that when police took Chavis into custody, she told him he was being arrested for rape. She also said that when he was seated in the back of the police car, he asked to speak to her. She said he spoke to her through the cracked window and "admitted to me on that date that he messed with [J.M.W.] the night prior to being arrested."

Cindy Woodham, a nurse manager at the emergency department of Flowers Hospital in Dothan, testified that she had been trained as a sexual assault nurse examiner. On February 10, 2004, she examined J.M.W. and discovered white scar tissue at the entrance of her vaginal area, which, Woodham said, would indicate that there had been an injury there. She also determined that J.M.W.'s hymen was not intact.

Chavis testified and denied having had sex with J.M.W. He said that the reason she hated him was that he was strict with her and made her do chores. He also testified that he was on heroin when he spoke to J.M.W. during the controlled call and claimed he was incoherent during parts of their conversation.

I

Chavis contends that the trial court erred in denying his motion to suppress the audio tape and transcript made of the controlled telephone call J.M.W. made from the Dothan police department. Specifically, Chavis contends that the tape should not have been admitted into evidence because,

21

he says, he was under the influence of heroin at the time the tape was made. He also appears to argue that a proper foundation had not been laid for the tape to be admitted. He also contends that there were some discrepancies between the transcript and the tape, and therefore, the transcript should not have been admitted into evidence.

The suppression hearing was held outside the presence of the jury; therefore, we review the evidentiary findings of the trial court at that hearing under the ore tenus standard.  Ex parte Jackson, 886 So.2d 155, 159 (Ala 2004).

> "Where evidence is presented to the trial court ore tenus in a nonjury case, a presumption of correctness exists as to the court's conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Odom v. Hull, 658 So. 2d 442 (Ala. 1995). However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment. Ex parte Board of Zoning Adiustment of the City of Mobile, 636 So. 2d 415 (Ala. 1994).
>
> "[Ex parte Agee], 669 So. 2d [102,] at 104 [(Ala. 1995)]. 'Where the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and [this Court] will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court's application of the law to those facts.'"

Jackson, 886 So. 2d at 159.

At the suppression hearing, the audio tape was played as the Court followed along with the transcript. Officer Robinson then testified that the tape played at the hearing was the tape he made at the police station, that the recording equipment was in working order, and that the tape was a true and accurate recording of the conversation between J.M.W. and Chavis. During cross-examination, Officer Robinson acknowledged that he could hear only J.M.W.'s side of the conversation as the tape was being made. Therefore, Chavis says, Officer Robinson could not properly testify that the tape was an

accurate recording of the conversation.

In Molina v. State, 533 So. 2d 701, 711 (Ala. Crim. App. 1988), this Court addressed the issue whether a videotape of a telephone call made by the defendant could be admissible if the police officer who was present at the time the videotape was made and called upon at trial to verify the tape "really wasn't paying that much attention to what [the defendant] was saying" because he was busy with other work. The officer was able to testify, however, that he did hear the defendant speaking "and was aware of the general tenor of the conversation." Id. On cross examination, the officer testified that before he reviewed the tape the morning of trial, he "could not testify specifically what the conversation [the defendant had on the telephone] was about," but on redirect he said that his memory had been refreshed when he reviewed the tape and that he could say that the tape was "accurate." Id.

The Molina Court held that the officer's testimony was sufficient to authenticate the tape. "Although he could not verify every word that the defendant uttered as one he personally heard, when 'portions of the tape's film and sound [are] verified by an eyewitness,' the videotape is admissible. United States v. Bynum, 567 F.2d 1167, 1177 (1st Cir. 1978). Since the defendant made no argument that the tape was inaccurate or had been altered, [the officer's] verification of the parts of the tape he heard was sufficient. See Louis  Vuitton, S.A. v. Spencer Handbags Corp., 765 F.2d 966, 974 (2d Cir. 1985)." Molina, 533 So. 2d at 711 (emphasis supplied in Molina); see also Ex parte Fuller, 620 So. 2d 675 (Ala. 1993) (The party offering the recording must present sufficient evidence to meet the 'reliable representation' standard. In other words, the witness must testify that he or she has sufficient personal knowledge of the sounds recorded and that the tape accurately and reliably represents the actual scene or sounds.).

In this case, Officer Robinson was able to verify that those portions of the audiotape depicting what he could hear during the conversation were accurate. Chavis made no claim that the tape was inaccurate or had been altered in anyway. Accordingly, Officer Robinson's testimony regarding the accuracy and authenticity of the tape were sufficient to allow the tape to be admitted into evidence.

B.

Chavis argues that the audiotape of the controlled telephone conversation between him and J.M.W. should not have been admitted because, he says, he was under the influence of heroin at the time of the controlled telephone call. At the suppression hearing, Chavis offered no evidence of his having been under the influence of heroin. His attorney simply asserted that Chavis had been under the influence, adding that Chavis had been taken to the hospital the night of his arrest "because of the effects of the heroin prior to locking him up permanently in the jail or incarcering him." No evidence of the hospital visit was introduced, however.

It is axiomatic that statements made by lawyers during the course of a hearing is not evidence. Allen v. State, 611 So. 2d 1152 (Ala. Crim. App. 1992). Chavis's lawyer had no personal knowledge of whether Chavis had been under the influence of heroin at the time of the taped telephone call. At the suppression hearing, Chavis presented no evidence to support his assertion that he had been under the influence of heroin when the tape was made. Accordingly, there was no basis for the trial court to refuse to allow the tape into evidence on the ground that Chavis was under the influence of heroin.

We note that during the trial, Chavis testified that he had been under the influence of heroin during the taped conversation with J.M.W. When asked whether he was telling the jury that he did not understand what he was saying at the time, Chavis responded, "I'm not going to say I didn't completely understand it." He presented no corroborating evidence of his claim that he was under the influence at the time. The jury was free to weigh Chavis's testimony against the tape to determine if he was coherent during the controlled conversation.

C.

Chavis contends that the transcript of the audiotape was erroneously admitted into evidence because, on cross examination, Officer Robinson said that when the tape had been played during the suppression hearing, he had not followed the transcript while listening to the tape. Therefore, Chavis asserts, he could not state that the transcript was substantially the same as the

tape.

In his brief, Chavis neglects to point out that, after Chavis's cross examination of Officer Robinson during the suppression hearing, the trial court and Officer Robinson had the following dialogue:

> "THE COURT: Have you at any time listened to the tape and compared it as you looked at the transcript on a prior occasion?
> "ROBINSON: I believe so, at -- it would have been either at preliminary or grand jury, one.
> "THE COURT: Okay. Did it substantially -- although maybe not exactly, but did the transcript substantially follow the tape?
> "ROBINSON: Yes, sir.
> "THE COURT: Of course, we have all listened to it and followed it, too."

The record does not support Chavis's contentions that Officer Robinson had not compared the transcript to the tape. Moreover, "A typewritten transcript of a recorded conversation is admissible where the officer who listened to the conversation at the time of the recording testifies that the transcript accurately reflected the conversation." Hawkins v. State, 443 So. 2d 1312, 1314 (Ala. Crim. App. 1983). Officer Robinson testified that he had listened to the audio recording and compared it to the transcript, and that the transcript substantially followed the tape. Accordingly, the trial court  properly admitted the transcript of the audiotape into evidence.

II.

Chavis asserts that the trial court erred in denying his motion for judgment of acquittal at the close of the State's evidence.

> "'Appellate courts are limited in reviewing a trial court's denial of a motion for judgment of acquittal grounded on insufficiency.' McFarland v. State, 581 So. 2d 1249, 1253 (Ala. Crim. App. 1991). 'The standard of review in determining sufficiency of evidence is whether evidence existed at the time [the defendant's] motion for acquittal was made, from which the jury could by fair inference find the

[defendant] guilty.' <u>Linzy v. State</u>, 455 So. 2d 260, 26[2] (Ala. Crim. App. 1984) (citing <u>Stewart v. State</u>, 350 So. 2d 764 (Ala. Crim. App. 1977), and <u>Hayes v. State</u>, 395 So. 2d 127 (Ala. Crim. App.), writ denied, 395 So. 2d 150 (Ala. 1981)). In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the State. <u>Linzy</u>, <u>supra</u>."

<u>Ex parte Burton</u>, 783 So. 2d 887, 890-91 (Ala. 2000).

In this case, Chavis was indicted for having sexual intercourse with J.M.W. by forcible compulsion, a violation of § 13A-6-61(a) (1), Ala. Code 1975. Forcible compulsion is defined as "[p]hysical force that overcomes earnest resistance or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person." § 13A-6-60(8).

J.M.W. testified that Chavis had begun forcing her to have sex with him when she was 11 or 12 years old and that the assaults continued for a number of years. She said he threatened to whip her if she did not have sex with him. On at least one occasion, she told him just to "whoop" her, but, she said, "I still got the same thing anyways."

The State also presented documentary evidence in the form of J.M.W.'s diary, in which she wrote that she hated Chavis and she hated the things he did to her, and the survey from House of Ruth, in which she indicated that her stepfather had been sexually assaulting her since she was 12 years old.

A sexual assault nurse examiner testified that J.M.W. had signs of an injury at the entrance to her vaginal area and that her hymen was not intact.

The State also introduced evidence of the controlled telephone call during which J.M.W. told Chavis she was pregnant and he told her to say the baby was "by what's his name," and if she stood by him, she would be all right.

From this evidence, the jury could certainly draw a fair inference that Chavis had had sexual intercourse with J.M.W. by forcible compulsion on

multiple occasions.  See Powe v. State, 597 So. 2d 721 at 728-29 (Ala. 1991).  The evidence was sufficient to send the case to the jury.  The trial court did not err in denying Chavis's motion for judgment of acquittal.

### III.

Chavis argues that the trial court erred in denying his motion for new trial. Chavis appears to argue that the State, in the form of the Department of Forensic Sciences, had exculpatory evidence that it had not yet provided to him at the time of trial. Specifically, Chavis contends that the DFS report on the examination of the Sexual Assault Evidence Kit containing evidence taken from J.W. and J.W.'s panties, a cloth, and blanket and comforter from J.W.'s bed was not provided to him by the time of trial. [According to the forensic report, each of these items was examined and analyzed for the presence of semen, but none was found.]  He also appears to claim that Officer Robinson "had only to pick up the phone and ask" the Department of Forensic Sciences for the forensic report in this case, dated January 17, 2006. Therefore, Chavis suggests, Officer Robinson was less than truthful when he testified at trial that he had not yet received the report from Forensic Sciences.

In his brief on appeal, Chavis cites no authority in support of this contention of error; therefore, he has waived this claim for appellate review. Jolly v. State, 858 So. 2d 305, 312 (Ala. Crim. App. 2002); Rule 28(a)(10), Ala.R.App.P.

### IV.

Chavis contends that he received ineffective assistance of counsel during the trial of this matter.  A review of the record shows that this issue was not presented to the trial court.  A claim for ineffective assistance of counsel cannot be presented on direct appeal when it has not first been presented to the trial court.  Montgomery v. State, 781 So.2d 1007 (Ala. Crim. App. 2000).  Because this issue was not raised before the trial court, this Court cannot consider it on direct appeal.

For the reasons set forth above, the judgment of the trial court is affirmed.

*Respondents' Exhibit 5 - Doc. No. 16-5* at 1-12 (citations to record and footnotes omitted).

Chavis filed an application for rehearing with the Alabama Court of Criminal Appeals in which he raised claims of ineffective assistance of trial counsel, those presented in the direct appeal brief in addition to claims alleging counsel failed to properly cross-examine the officer regarding the status of the forensics report, did not make a proper motion for judgment of acquittal nor seek acquittal at all available stages of the proceedings and erred by making comments regarding Chavis during his cross-examination by the prosecution. *Respondents' Exhibit 6 - Doc. No. 16-6*. The Alabama Court of Criminal Appeals overruled the application for rehearing on April 13, 2007. *Respondents' Exhibit 7 - Doc. No. 16-7*. Chavis then filed a petition for writ of certiorari with the Alabama Supreme Court proceeding on his claims of ineffective assistance of trial counsel. *Respondents' Exhibit 8 - Doc. No. 16-8*. The Alabama Supreme Court denied the petition for writ of certiorari on June 15, 2007 and the certificate of judgment issued on this same date. *Respondents' Exhibit 10 - Doc. No. 16-10*.

On August 28, 2007, Chavis filed a *pro se* state post-conviction petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure with the Circuit Court of Houston County, Alabama.[5] In this petition, Chavis alleged that: (i) The trial court was without

---

[5]Chavis certified that he placed the Rule 32 petition in the prison mail system on August 28, 2007. *Respondents' Exhibit 12 - Doc. No. 16-12* at 26. As previously noted, a pro se inmate's petition is deemed filed in federal cases the date the petition is delivered to prison officials for mailing. *Houston,* 487 U.S. at 271-272. "Alabama courts have [adopted this rule and] held that a pro se incarcerated petitioner/appellant is considered to have 'filed' a Rule 32 petition, a notice of appeal, or a petition for a writ of certiorari when those documents are given to prison officials

authority to appoint counsel, allow him anything at State expense or order the payment of fees, costs or compensation without a formal declaration of indigence; (ii) The trial court deprived Chavis of his right to choose counsel; (iii) The trial court was without jurisdiction to render judgment or impose sentence because it failed to swear both the jury venire and the petit jury; (iv) The trial court lacked jurisdiction because "authorized counsel of record" did not represent Chavis at sentencing; (v) Appellate Counsel was ineffective because he did not represent Chavis at sentencing and failed to cite any authority to support the claim alleging suppression of exculpatory evidence by the state forensics lab; (vi) Trial counsel was ineffective because she (a) was unauthorized to represent Chavis at sentencing, (b) failed to object to the trial court's failure to provide an oath to the jury venire prior to voir dire,  (c) failed to object to the trial court's lack of an oath to the petit jury prior to trial, (d) did not call the private investigator as a witness for the purpose of having him testify as to statements he had received from other individuals,[6] (e) failed to file a motion for more definite statement requesting that each indictment reflect the date, time

---

for mailing." *Ex parte Allen*, 825 So.2d 271, 272 (Ala. 2002); *Holland v. State*, 621 So.2d 373, 375 (Ala.Crim.App. 1993) ("[A] pro se incarcerated petitioner 'files' a Rule 32 petition when he hands the petition over to prison authorities for mailing."). Consequently, the prison mailbox rule applies to pro se Rule 32 petitions and other pro se applications or motions filed in the state courts of Alabama. Thus, August 28, 2007 is the appropriate date of filing for Chavis's Rule 32 petition. In addition, the date of filing for other pro se motions/applications filed in the state courts would be the date Chavis placed the document in the prison mail system. "Furthermore, the mailbox rule applies even when the motion 'is never received or filed by the court.'" *Gracey v. United States*, 131 Fed. Appx. 180, 181 (11th Cir. 2005). The burden is on the State to prove that an inmate "did not mail his petition in a timely manner under the mailbox rule." *Id*; *Washington v. United States,* 243 F.3d 1299, 1301 (11th Cir. 2001).

[6]It is clear that the testimony sought from the investigator would have been hearsay and inadmissible at trial.

and place of the alleged offense and the age of the victim at the time of the charged offenses,[7] (f) failed to request a jury instruction on the lesser included offense of first degree sexual abuse, (g) failed to call any witness at the suppression hearing to testify regarding Chavis' state of heroin intoxication during the telephone call with the victim, and (h) failed to object to the jury instruction permitting consideration of the victim's age in determining the element of forcible compulsion when her age was not listed in the indictment. *Respondents' Exhibit 12 (Chavis' Rule 32 Petition) - Doc. No. 16-12* at 21-23.

On September 24, 2007, the trial court denied Chavis relief on the claims raised in his Rule 32 petition. *Respondents' Exhibit 12 - Doc. No. 16-12* at 48. Chavis appealed the denial of his Rule 32 petition in which he raised the same claims as those presented to the trial court. The Alabama Court of Criminal Appeals issued a memorandum opinion on September 19, 2008 affirming the trial court's decision to deny post-conviction relief. *Respondents' Exhibit 14 - Doc. No. 10-14.* The portion of this opinion relevant to the instant case reads as follows:

> In his [Rule 32] petition filed in Houston [County] Circuit Court on September 10, 2007, Chavis claimed that: (1) the trial court was without authority to appoint counsel without declaring him indigent; (2) the trial court deprived him of his right to choice of counsel when it appointed counsel without authority to do so; (3) the court was without jurisdiction to render judgment or to impose sentence (a) because it did not swear both the jury venire and the petit jury before trial commenced, and (b) because

---

[7]The age of the victim is not an element of the charges lodged against Chavis as the indictments alleged that Chavis engaged in sexual intercourse with the victim by forcible compulsion. *See Ala. Code* § 13A-6-61(a)(1).

counsel [appointed to represent him on appeal] did not represent him [at sentencing]; and (4) he received ineffective assistance of counsel at trial and on appeal.

The State responded by filing a motion for summary disposition arguing that the petition failed to state a claim for which relief may be granted, the grounds were or could have been raised at trial or on appeal, the grounds did not amount to newly discovered evidence, and the grounds are refuted by the record.  [The State attached as exhibits to its response an affidavit of substantial hardship signed by Chavis and an order signed by the trial judge indicating that the jury was duly empaneled, sworn and charged in accordance with applicable law.]  On Septebmer 24, 2007, the trial court entered the following order:

> "Def.'s petition as to the atty. appointment and sworn jury issues is denied due to his false allegations and for failure to state a claim.  All other aspects of his petition are dismissed for failure to state a claim.  Jackson, Judge."

On appeal, Chavis reasserts the same issues as in the court below, except that he abandons the claims 1 and 2 regarding appointment of counsel.  He concedes that the State refuted those claims "by introducing evidence into the record."  Chavis claims:  (1) that the record does not affirmatively show that the jury venire and the petit jury were properly sworn; (2) that Counsel Judah who represented him at sentencing was authorized to do so; and (3) that both trial and appellate counsel were ineffective for the nine reasons set out in his petition.

## I.

Chavis' first claim that the jury venire nor the petit jury were properly sworn is not meritorious because there is an affirmative showing in the record that the oath was administered.  We have examined the original record on direct appeal and note that the transcript of the trial indicates that both the jury venire and the petit jury were properly sworn.  "(Thereupon, the judicial assistant swore in the jury venire.)"  Page 23 of the court reporter's transcript in CR-05-1040.  "(Thereupon, the jury was impaneled and sworn.)"   Page 33 of the court reporter's transcript in CR-05-1040.  See Gardner v. State, 48

Ala. 263 (1872); <u>Lacey v. State</u>, 58 Ala. 385 (1877).

## II.

Chavis next claims that counsel who represented him at trial was unauthorized to do so.  He says a new sentence proceeding is due because Counsel Judah, not Counsel Gourley, represented him at sentencing.  According to the record in his direct appeal, the trial court originally appointed Joe. E. Herring, Jr. to represent Chavis at trial.  On November 4, 2004, attorney Herring filed a motion to withdraw which the trial court granted on November 5, 2004, and appointed attorney Valerie D. Judah to represent him.  Attorney Judah appeared on his behalf at trial [in January of 2006 and] at sentencing [on February 28, 2006].  Attorney Brent H. Gourley was appointed by the trial court to represent Chavis on appeal.  There is no merit to the appellant's argument that he should have been represented at sentencing by the attorney appointed to represent him on appeal, and no relief is due on that claim.

## III.

The first three of Chavis's stated grounds for ineffective assistance of counsel concern his claim in part two, that the counsel who represented him at sentencing was not authorized to do so.  Having found that ground non-meritorious, there was no ineffective assistance of trial or appellate counsel based on that ground.  The next two grounds concern his claim in part one that the jury venire and petit jury were not sworn.  Having found that ground non-meritorious [as refuted by the record], there was no ineffective assistance of trial counsel based on that ground.   Counsel cannot be ineffective for failing to raise nonmeritorious claims.  <u>Gibby v. State</u>, 753 So.2d 1206, 1207 (Ala.Crim.App. 1999).

The next five grounds regarding ineffective assistance of trial counsel are:  failure to call the private investigator as a witness; failure to file a motion for a more definite statement on each indictment; failure to request a jury instruction on the lesser included offense of first-degree sexual abuse; failure to call any witness to testify to Chavis's state of intoxication during the telephone call with the victim; and failure to object to the jury instruction involving consideration of the age of the victim.  The last ground he presents

is that his appellate counsel was ineffective for failure to cite any authority to support the issue that an agency of the state withheld exculpatory evidence. Although the appellant did elaborate on these grounds in his brief to this court, his petition contained nothing more than the allegations. The petition did not meet the burden of proof or specificity requirements of Rules 32.3 and 36.6(b), Ala.R.Crim.P., and those claims were properly dismissed by the trial court.

The judgment of the trial court is due to be affirmed.

*Respondents' Exhibit 14 - Doc. No. 16-14* at 2-6. Chavis maintains that he submitted an application for rehearing to prison officials for mailing on September 30, 2008.[8] The record demonstrates that the Alabama Court of Criminal Appeals did not receive an application for rehearing, and therefore issued the certificate of judgment on October 8, 2008. *Respondents' Exhibit 15 - Doc. No. 16-15.*

Upon receipt of the certificate of judgment, Chavis immediately filed a motion for suspension of the rules pursuant to Rule 4(b) of the Alabama Rules of Appellate Procedure seeking relief from the judgment issued by the Alabama Court of Criminal Appeals. *Petitioner's Response - Doc. No. 19*; *Petitioner's Supplemental Response - Doc. No. 25.* The appellate court received this motion on October 16, 2008, *Respondents' Exhibit A to the First Supplemental Answer - Doc. No. 23-1*, and issued an order denying the motion on October 29, 2008. *Id.*; *Petitioner's Attachment to Response - Doc. No. 19-1* at 17.

---

[8] Chavis mailed the Attorney General's copy of the application to the Alabama Court of Criminal Appeals and requested that "the appellate clerk ... place [the] copy into the Attorney General's mailbox for service." *Attachment to Response - Doc. No. 19-1* at 13.

Chavis then filed a petition for writ of mandamus in the Alabama Supreme Court on November 12, 2008 seeking "recall of the certificate of judgment" issued on appeal of his Rule 32 petition. *Id*. at 15. In support of this motion, Chavis argued that he filed a motion for additional facts/application for rehearing with the Alabama Court of Criminal Appeals on September 30, 2008 and that he never "received this motion and application returned in the mail nor ... an order ... overruling the same before the certificate of judgment was issued" thereby warranting withdrawal of the certificate of judgment. *Id*. at 14-15. The Alabama Supreme Court denied the petition for writ of mandamus on January 22, 2009. *Respondents' Exhibit A to the First Supplemental Answer - Doc. No. 23-1.*

Chavis initiated this 28 U.S.C. § 2254 action on March 23, 2009. In this habeas petition, Chavis asserts the following claims for relief:

1. The trial court lacked jurisdiction to impose sentence because appellate counsel was absent at sentencing.

2. Trial counsel was unauthorized to represent the petitioner at sentencing but if authorized she provided ineffective assistance during sentencing because she failed to move for a continuance to obtain the assistance of appellate counsel.

3. Appellate counsel was ineffective because he failed to represent the petitioner at sentencing and did not seek trial counsel's assistance on direct appeal.

4. Trial counsel provided ineffective assistance

34

when she failed to call the private investigator to testify regarding statements made to him by other individuals during his investigation of the case.

5.    Trial counsel failed to file a motion for more definite statement regarding the indictments seeking information with respect to the time, date and place of each alleged act charged and because no age of the victim was referenced in the indictments.[9]

6.    Trial counsel was ineffective for failing to request a jury charge on the lesser included offense of first degree sexual abuse.

7.    Trial counsel was ineffective for failing to call witnesses at the suppression hearing to testify regarding the petitioner's state of intoxication at the time of the controlled telephone call with the victim.

8.    Trial counsel was ineffective for failing to object to the jury instruction allowing the jury to consider the age of the victim in determining

---

[9]A federal district court's review of a claim attacking the sufficiency of an indictment is limited to considering the adequacy of the notice afforded a petitioner through the state procedures. The Due Process Clause of the Fourteenth Amendment requires that whatever charging method the State chooses to employ, it must give the criminal defendant fair notice of the charge against him to permit adequate preparation of his defense. *Jackson v. Virginia,* 443 U.S. 307, 314 (1979); *Faretta v. California,* 422 U.S. 806, 818 (1975). "The sufficiency of a state indictment is an issue on federal habeas corpus only if the indictment was so deficient that the convicting court was deprived of jurisdiction. *DeBenedictis v. Wainwright,* 674 F.2d 841 (11th Cir.1982)." *Heath v. Jones*, 863 F.2d 815, 821 (11th Cir. 1989); *Branch v. Estelle,* 631 F.2d 1229, 1233 (5th Cir. 1980) ("[T]he sufficiency of a state indictment is not a matter for federal habeas corpus relief unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction."). The indictments issued against Chavis substantially tracked the language of the state statute defining first degree rape by forcible compulsion and incorporated all elements requisite to the commission of this offense. *Ala. Code* § 13A-6-61(a)(1). The victim's age is not a necessary element of first degree rape by forcible compulsion. Thus, the indictments were not fatally defective as they provided Chavis sufficient notice of the charges lodged against him so as to allow preparation of an adequate defense, and, therefore, "the state trial court was not deprived of jurisdiction." *Heath*, 863 F.2d at 821. Consequently, the indictments did not deprive Chavis of any constitutionally protected interest and counsel's failure to challenge the sufficiency of the indictments provides no basis for relief.

forcible compulsion.

9.    Appellate counsel was ineffective for failing to cite any authority on direct appeal to support the claim that an agent of the State withheld exculpatory evidence from the defense, i.e., the prosecution team did not provide the defense with a report in the possession of the Alabama Department of Forensic Sciences.

*Amendment to the Petition for Writ of Habeas Corpus Relief - Doc. No. 7* at 1-6.

In their answer to the petition, the respondents argue that the claims pending before this court entitle Chavis to no relief.  Specifically, the respondents assert that Chavis' claims for federal habeas relief are procedurally barred from review because Chavis failed to present these claims to the state courts during the Rule 32 proceedings as required by the State's procedural rules.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732-1733 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including review by the state's court of last resort, even if review in that court is discretionary.); *Pruitt v. Jones*, 348 F.3d 1355, 1359 (11th Cir. 2003) ("Nothing in *Boerckel's* reasoning suggests that a different rule should apply in state post-conviction appeals as opposed to direct appeals."); *Smith v. Jones*, 256 F.3d 1135, 1140 (11th Cir. 2001), *cert. denied*, 534 U.S. 1136, 122 S.Ct. 1081, 151 L.Ed.2d 982 (2002) ("Alabama's discretionary direct review procedures bring Alabama prisoner habeas

36

petitions within the scope of the *Boerckel* rule."); *Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002); *Holladay v. Haley*, 209 F.3d 1243, 1254 n. 9 (11th Cir.), *cert denied*, 531 U.S. 1017 (2000); *Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999); *Atkins v. Singletary*, 965 F.2d 952, 955 (11th Cir. 1992); *Collier v. Jones*, 901 F.2d 770, 773 (11th Cir. 1990).  In order to provide the state courts with the requisite full and fair opportunity to address his claims, "the petitioner [must] 'fairly present' his federal claims to the state courts in a manner to alert them that the ruling under review violated a federal constitutional right.  *Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971)).  Exhaustion is not satisfied 'merely' if the petitioner presents the state court with 'all the facts necessary to support the claim' or even if a 'somewhat similar state-law claim was made.'  *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004) (citation omitted)."  *Pearson v. Sec'y for Dept. of Corr.*, 273 Fed.Appx. 847, 849-850 (11th Cir. 2008).  As support for their procedural default argument, the respondents maintain that Chavis failed to file an application for rehearing upon issuance of the memorandum opinion by the Alabama Court of Criminal Appeals affirming the denial of his Rule 32 petition.  Additionally, the record demonstrates that Chavis is entitled to no relief from this court as the state courts properly adjudicated each his claims on the merits.  *Price v. Vincent*, 538 U.S. 634, 638, 123 S.Ct. 1848, 1852 (2003) ("A habeas petitioner

37

whose claim was adjudicated on the merits in state court is not entitled to relief in federal court unless he meets the requirements of 28 U.S.C. § 2254(d)."); *Williams v. Taylor*, 529 U.S. 362, 402, 120 S.Ct. 1495, 1518 (2000) (same).

Upon review of the § 2254 petition, the answers of the respondents, Chavis' responses to the answers, the state court record, opinions issued by the state courts and applicable federal law, this court finds that no evidentiary hearing is required, Rule 8(a), *Rules Governing Section 2254 Cases in United States District Courts*, and concludes that the petition is due to be denied.

## II.  DISCUSSION

### A.  The Procedural Default Argument

The respondents assert that the claims presented in the instant petition are procedurally defaulted as Chavis failed to file an application for rehearing on appeal from the denial of his Rule 32 petition.  In support of this argument, the respondents maintain that the Alabama Court of Criminal Appeals did not receive an application for rehearing, nor did Chavis utilize the free legal mail option provided by the prison system. *Respondents' Supplemental Answer - Doc. No. 23*.  The respondents submitted affidavits from mail clerks at the St. Clair Correctional Facility which demonstrated that "[a]n inmate may send up to two pieces of legal mail without paying any charge for postage.  The mailroom keeps a log of all such legal mail.... Except for the log ... for outgoing legal mail

[utilizing free postage provided by correctional officials], St. Clair Correctional Facility does not keep a log of every piece of outgoing mail.... Each [other] piece of outgoing mail is checked to insure that it complies with the prison's mail policy (for example, outgoing mail must have a return address that includes the inmate's full name and AIS number). If a piece of outgoing mail fails to comply with the mail policy, the inmate who sent it is notified of this, and the piece of mail is returned to the inmate, so that he may remedy the deficiency. In addition, outgoing mail is weighed to make sure that it has adequate postage; if it does not, the inmate is notified that the postage is insufficient and the piece of mail is returned to the inmate." *Respondents' Exhibit C to the Supplemental Answer (Affidavit of Brenda Rivers) - Doc. No. 23-3* at 2.

Chavis argues that his claims are not procedurally barred from review by this court. Specifically, Chavis maintains that on September 30, 2008, he placed an application for rehearing in the general outgoing prison mail bearing postage he personally obtained without using the free postage provided for legal mail. *Affidavit in Support of Chavis' Response to the Respondents' Answer (Affidavit of Elmer L. Chavis) - Doc. No. 19* at 3 ("I mailed an original and an extra copy of a Rule 39(k) motion for additional facts and Rule 40 application for rehearing and brief and argument to the Court of Criminal Appeals of Alabama on September 30, 2008. The extra copy was to be placed [by the appellate clerk] into the attorney general's mailbox for service on him."); *Chavis' Response to the*

39

*Respondents' Supplemental Answer - Doc. No. 25* at 2 ("[U]nder penalty of perjury, Chavis

mailed timely [via general outgoing prison mail] the Rule 39(k) and Rule 40 Rehearing to

the State appellate court.").  Chavis further argues that correctional officials did not return

to him the envelope in which he mailed the application for rehearing, thereby indicating

that this piece of mail complied with the prison's outgoing mail policy, including the listing

of his return address and the presence of sufficient postage.  *Chavis' Response to the*

*Respondents' Answer (Affidavit of Elmer L. Chavis) - Doc. No. 19* at 3.  Chavis also points

out that the respondents concede that "St. Clair facility does not keep a log of every piece

of outgoing mail." *Chavis' Response to the Respondents' Supplemental Answer - Doc. No.*

*25* at 2.  In addition, Chavis correctly notes that inmates do not have access to an unlimited

amount of postage for two pieces of legal mail each week as implied by the respondents

but "only get two free [first class] stamps for legal mail per week.  This amount of postage

would not be sufficient for a double set of all the papers to be mailed [regarding the

application for rehearing].  This is why Chavis used his own postage and probably the

reason no mail clerk recorded his outgoing legal mail." *Id*.  Finally, Chavis maintains that

"immediately when [he] received a certificate of judgment 18 days after the affirmed by

memorandum was issued, he filed a Rule 2(b) motion [for suspension of the rules] because

this alerted him that [the appellate court] did not receive his Rule 39(k) and Rule 40

Application for Rehearing and when this [Rule 2(b)] motion was denied, he filed a

mandamus petition in the Supreme Court of Alabama for the same thing." *Id*. at 1-2; *Chavis' Response to the Respondents' Answer (Affidavit of Elmer L. Chavis) - Doc. No. 19* at 3 ("When I received a certificate of judgment from the Court of Criminal Appeals I immediately filed a Rule 2(b) motion and it was denied.   Then I immediately filed a petition [for] a writ of mandamus in [the] Alabama Supreme Court....   I did everything I knew how to do to correct this mistake timely.   It is not my fault that the appellate court did not receive my documents....").

### 1. The Prison Mailbox Rule

Pursuant to the mailbox rule, a document deposited by a prisoner in the prison's mail system or delivered to prison officials for submission to a court is deemed "filed at the time [the prisoner] delivered it to the prison authorities for forwarding to the court clerk." *Houston*, 487 U.S. at 276.  The bright line rule set forth in "*Houston* does not create an exception for a pro se inmate to evade time requirements, but states an equitable, standardized method for measuring time restrictions so that requisite time limitations for filing do not preclude the incarcerated petitioner's equal access to the courts." *Garvey*, 993 F.2d at 780.  Alabama courts apply the mailbox rule to pro se prisoner post-conviction filings. *Ex parte Allen*, 825 So.2d at 272; *Holland*, 621 So.2d at 375.  "Furthermore, the mailbox rule applies even when the motion 'is never received or filed by the court.' *Huizar v. Carey*, 273 F.3d 1220, 1222 (9th Cir. 2001)." *Gracey*, 131 Fed.Appx. at 181; *Allen v.*

41

*Culliver*, 471 F.3d 1196 (11th Cir. 2006) (holding that if a district court determines that inmate timely delivered a notice of appeal to the proper prison authority for mailing, the document must be deemed filed on the date it was delivered to prison officials for mailing, even though it is never received by the court).  Due diligence by the inmate in following up once he has failed to receive a disposition from the court after a reasonable period of time is not a requirement for application of the mailbox rule.  *Allen*, 471 F.3d at 1198.  The Court did, however, advise that in determining whether and when a document was delivered to prison officials for mailing "[t]he district court may take into account any and all relevant circumstances, including any lack of diligence [or acts of diligence] on the part of [the inmate] in following up in a manner that would be expected of a reasonable person in his circumstances in deciding whether the [document] was delivered to prison authorities [for mailing]."  *Id*.  In addition, the burden of proof rests with the State to demonstrate that the inmate did not timely provide the challenged document to prison officials for mailing. *Id*.

Upon review of all evidentiary materials submitted by the parties, the Court finds that Chavis submitted his application for rehearing with proper postage to prison authorities for mailing on September 30, 2008.[10]  In so doing, Chavis properly filed an

[10]Under the facts and circumstances of this case, the court deems it unnecessary to conduct an evidentiary hearing on application of the prison mailbox rule as, despite the opportunity to do so, the respondents have presented no valid factual basis undermining the assertions presented by Chavis.  In addition, based on the arguments set forth by the respondents, the court cannot countenance that they have or could obtain any additional evidence to satisfy their burden of proof that Chavis did not deliver his application for rehearing to prison officials for mailing, properly

42

application for rehearing on this date despite the fact that the application was never received by the Alabama Court of Criminal Appeals. *Allen*, 471 F.3d at 1198; *Gracey*, 131 Fed.Appx. at 181.

## 2. *Application of the Prison Mailbox Rule*

Chavis submitted an affidavit and statement under penalty of perjury that he placed his application for rehearing in the general outgoing prison mail on September 30, 2008. Chavis also stated in his affidavit that the envelope containing the application for rehearing was not returned to him by prison officials for insufficient postage, which he argues indicates that the document contained proper postage.  In addition, Chavis advised that he did not use the prison's legal mail procedure and the two free first class stamps in filing his application for rehearing but, instead, placed personal stamps on the envelope.  Moreover, it is undisputed that upon his receipt of the certificate of judgment, absent a ruling on his application for rehearing, Chavis immediately filed a motion for suspension of the rules with the Alabama Court of Criminal Appeals in which he addressed the failure of the appellate court to receive his application for rehearing. When the Alabama Court of Criminal Appeals denied this motion, Chavis filed a petition for writ of mandamus with the Alabama Supreme Court seeking relief from the certificate of judgment and an order allowing him to proceed on his application for rehearing.

---

addressed and postage pre-paid, on September 30, 2008.

The Court in *Allen* makes it incumbent on the respondents to prove that Chavis did not deliver his application for rehearing to prison officials on September 30, 2008. The response and evidentiary materials filed by the respondents fail to meet this burden. Instead, the affidavits submitted by the respondents arguably lend credence to the arguments set forth by Chavis, as these materials establish that during the relevant time period the Alabama Department of Corrections had no policy or practice of maintaining records of outgoing mail addressed to the courts for which an inmate did not request the free postage provided for purposes of legal mail. The State has opted not to maintain records regarding all outgoing mail, including legal mail sent by an inmate which does not utilize the permitted free postage. This court cannot allow a strategic advantage to the State for this omission, nor can it fault Chavis for using his personal postage and the general outgoing mail to file documents with a court.

The respondents likewise seek to cast doubt on Chavis' assertion that he placed the application for rehearing in the general outgoing mail on September 30, 2008 by arguing that: (i) The fact that the Alabama Court of Criminal Appeals nor the Attorney General's Office "received the document indicates that Chavis never actually sent it[;]" and (ii) Even had Chavis used the general prison mail system, "his application for rehearing would have reached the court" because inmate mail is due to be processed in accordance with standard prison procedure and they have no knowledge that any one at the prison interfered with

44

Chavis' mail. *Respondents' Supplemental Answer - Doc. No. 23* at 5-6. However, the State's position does not address the possibility that the United States Postal Service lost Chavis' application for rehearing, nor does it totally foreclose the possibility that the document was mishandled by prison officials. Furthermore, this argument fails to satisfy the State's burden of proving that Chavis failed to submit his application for rehearing to prison officials for mailing. Additionally, the fact that Chavis acted with diligence in challenging the dismissal of his Rule 32 appeal bolsters his position that he placed the application for rehearing in the prison mail system on September 30, 2008. The policy implemented by the Alabama Department of Corrections regarding outgoing general mail places the State in a vulnerable position with respect to arguments such as those presented by Chavis, and results in the respondents' being ill-equipped to dispute his assertions.

For the reasons set forth herein, the court concludes that Chavis delivered his application for rehearing to prison officials for mailing on September 30, 2008. Chavis is therefore entitled to the benefit of the prison mailbox rule, and his application for rehearing is thereby considered filed with the Alabama Court of Criminal Appeals on September 30, 2008. Consequently, the claims for relief presented by Chavis are not barred from review by this court under the doctrine of procedural default.

## B. Adjudication of Claims

The instant petition for federal habeas relief is governed by 28 U.S.C. § 2254, as

45

amended by the Anti-Terrorism and Effective Death Penalty Act ["AEDPA"].  "A habeas

petitioner whose claim was adjudicated on the merits in state court is not entitled to relief

in federal court unless he meets the requirements of 28 U.S.C. § 2254(d)." *Price*, 538 U.S.

634, 638, 123 S.Ct. 1848, 1852; *Williams*, 529 U.S. 362, 402, 120 S.Ct. 1495, 1518.  Under

the provisions of 28 U.S.C. § 2254(d), with respect to a claim adjudicated on the merits in

state court, federal habeas relief from a state court judgment may not be granted unless the

adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

In *Williams*, the Supreme Court held:

> Under the "contrary to" clause a federal court may grant the
> writ if the state court arrives at a conclusion opposite to that
> reached by this Court on a question of law or if the state court
> decides a case differently than this Court has on a set of
> materially indistinguishable facts.  Under the "unreasonable
> application" clause, a federal habeas court may grant the writ
> if the state court identifies the correct governing legal principle
> from this Court's decisions but unreasonably applies that
> principle to the facts of the prisoner's case.

529 U.S. at 412-413, 120 S.Ct. at 1523.

The Court subsequently explained that habeas relief is appropriate when a petitioner

demonstrates "that a decision by a state court is 'contrary to' ... clearly established

[Supreme Court] law if it 'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.' *Williams v. Taylor*, 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146 L.Ed. 2d 389 (2000)." *Price*, 538 U.S. at 640, 123 S.Ct. at 1853. Additionally, federal review in a habeas action "is limited to whether the state court's decision was objectively unreasonable in the light of clearly established federal law. *Williams*, [529 U.S. at 409],120 S.Ct. at 1521." *Hawkins v. Alabama*, 318 F.3d 1302, 1310 (11th Cir. 2003); *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001), citing *Williams*, *supra* ("[F]ederal habeas relief [is] available under the 'unreasonable application' standard only if the state court's application of clearly established federal law was 'objectively unreasonable.'").  Thus, a federal court is not to decide "the correctness *per se* ... of the state court decision" but only the "objective reasonableness" of such decision.  *Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001).  Moreover, "an ***unreasonable*** application of federal law is different from an ***incorrect*** application of federal law."  *Williams*, 529 U.S. at 410, 120 S.Ct. at 1522 (emphasis in original).  "Clearly established federal law is ***not*** the law of the lower federal courts, including this court.  Instead, in the habeas context, clearly established federal law 'refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision.' *Williams*, 529 U.S.

47

at 412, 120 S.Ct. at 1523." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (emphasis in original).

It is clear that "§ 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. 529 U.S., at 404–405, 120 S.Ct. 1495.  A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. *Id.,* at 405–406, 120 S.Ct. 1495. The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  *Id.,* at 407–408, 120 S.Ct. 1495.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one.  *Id.,* at 409–410, 120 S.Ct. 1495.  See also *id.,* at 411, 120 S.Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly')."  *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Windom v. Secretary, Dept. of Corrections*, 578 F.3d 1227 (11th Cir. 2009) ("A state court decision is contrary to clearly established federal law if it applies a rule that contradicts the governing

law set forth in Supreme Court cases or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Court's.") (quotation and other marks omitted); *Williams*, 529 U.S. at 411, 120 S.Ct. at 1522 ("Under § 2254(d)(1)'s 'unreasonable application' clause, ... a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."); *Putman*, 268 F.3d at 1241 ("A state court conducts an 'unreasonable application' of clearly established federal law if it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case.").

Federal district courts are likewise directed to determine whether the state court based its findings on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court's determinations of fact shall be "presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). However, even when the state court addresses a question of law, this court is not authorized "to evaluate [a petitioner's] claim *de novo* rather than through the lens of § 2254(d)." *Price*, 538 U.S. at 639, 123 S.Ct. at 1852. The Supreme Court admonishes that such *de novo* evaluation "exceeds the limits imposed on

federal habeas review by 28 U.S.C. § 2254(d)...."  538 U.S. at 636, 123 S.Ct. at 1851.

As is clear from the foregoing, a federal "district court's review ... [of claims decided by the state courts] is greatly circumscribed and highly deferential to the state courts." *Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2007).  The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 694.  Additionally, "[t]he usual 'presumption that state courts know and follow the law' is even stronger in the AEDPA context because § 2254(d)'s 'highly deferential standard for evaluating state-court rulings ... demands that state-court decisions be given the benefit of the doubt.' *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002) (internal citation omitted)." *Allen v. Secretary, Florida Dept. of Corrections*, 611 F.3d 740, 748 (11th Cir. 2010).  "In order to merit AEDPA deference the state court need not expressly identify Supreme Court precedent, nor make a perfect statement of the applicable rule of law, nor provide a detailed opinion covering each aspect of the petitioner's argument." *Smith v. Secretary, Dept. of Corrections*, 572 f.3d 1327, 1333 (11th Cir. 2009).  "All that is required under § 2254(d)(1) [for deference to the decision of the state court] is an adjudication on the merits, not a full state court opinion." *Parker v. Secretary, Dept. of Corrections*, 331 F.3d 764, 776 (11th Cir. 2003).

50

Chavis challenges the jurisdiction of the trial court due to his representation by only trial counsel during sentencing. Chavis also alleges that trial and appellate counsel provided him ineffective assistance. These claims entitle Chavis to no relief from this court because the state courts properly adjudicated the claims on the merits during the Rule 32 proceedings.

(a) <u>The Jurisdiction Claim</u>. On appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals determined that Chavis' claim challenging the jurisdiction of the trial court lacked merit. *Respondents' Exhibit 14 - Doc. No. 16-14* at 5 ("There is no merit to the appellant's argument that he should have been represented at sentencing by the attorney appointed to represent him on appeal, and no relief is due on that claim."). The decision issued by the Alabama Court of Criminal Appeals was not contrary to clearly established federal law, was objectively reasonable, and also represented a reasonable determination of the facts in light of the evidence presented by the parties. Thus, Chavis is not entitled to relief from this court on his challenge to the jurisdiction of the trial court.

(b) <u>Ineffective Assistance of Trial and Appellate Counsel</u>. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme set forth the clearly established federal law on the issue of ineffective assistance of counsel. The Sixth Amendment right to counsel exists to protect the fundamental right to a fair trial. The

51

petitioner must satisfy the requirements of a two-pronged test to prevail on his claims of ineffective assistance of counsel. First, the petitioner must establish that the performances of his attorneys "fell below an objective standard of reasonableness." *Strickland* 466 U.S. at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* Once this threshold test is met, the petitioner must then show that the deficient performance of his counsel prejudiced his defense. *Id.* at 687. To establish prejudice, the petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Unreliability or unfairness does not result if counsel's ineffectiveness does not deprive the defendant of any substantive or procedural right to which the law entitles him. *Williams*, 529 U.S. at 393 n. 17. There is a strong presumption that counsel's performance was reasonable and adequate and great deference is shown to choices dictated by reasonable trial strategy. *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Any review of an ineffective assistance of counsel claim is conducted from the perspective of defense counsel based on facts "as they were known to counsel at the time of the representation." *United States v. Teague*, 953 F.2d 1525, 1535 (11th Cir. 1992). The test used to evaluate claims of ineffective assistance of trial counsel applies equally to an analysis of claims of ineffective assistance of appellate counsel. *Jackson v. Dugger*, 931 F.2d 712, 715 (11th Cir. 1991). Appellate counsel cannot be deemed ineffective for failing

to raise meritless claims on appeal. *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001); *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000); *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").

Chavis maintains that he received ineffective assistance from trial counsel because she failed to (i) file a motion for a continuance at sentencing to obtain the assistance of appellate counsel, (ii) call the private investigator as a witness, (iii) file a motion for more definite statement with respect to the lack of factual information contained in the indictments, (iv) request a jury charge on the lesser included offense of first degree sexual abuse, (v) call witnesses at the suppression hearing to provide testimony as to Chavis' state of intoxication during the controlled telephone call with the victim, and (vi) object to the jury instruction on forcible compulsion which referenced the victim's age. Chavis also contends that direct appeal counsel rendered ineffective assistance because he failed to appear at sentencing, did not seek trial counsel's assistance on appeal and failed to cite authority in support of his claim alleging that an agency of the State withheld exculpatory evidence from the defense.

On appeal from the trial court's denial of the Rule 32 petition, the Alabama Court of Criminal Appeals deemed that Chavis failed to establish entitlement to relief on his claims of ineffective assistance of counsel. Thus, the issue before this court is whether the

state court's decision was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or constituted an unreasonable determination of of the facts based on the evidence submitted by the parties.

Initially, the appellate court determined that Chavis' claims of ineffective assistance of trial and appellate counsel arising from representation by only trial counsel at sentencing lacked merit. *Respondents' Exhibit 14 - Doc. No. 16-14* at 4-5 (After withdrawal by counsel initially appointed to represent Chavis, the court "appointed attorney Valerie D. Judah to represent him. Attorney Judah appeared on his behalf at trial [and] at sentencing.... Attorney Brent H. Gourley was appointed by the trial court to represent Chavis on appeal. There is no merit to the appellant's argument that he should have been represented at sentencing by the attorney appointed to represent him on appeal....  Having found [his challenge to sole representation by trial counsel at sentencing] non-meritorious, there was no ineffective assistance of trial or appellate counsel based on that ground.").  This determination by the state court was neither contrary to clearly established federal law nor objectively unreasonable and constituted a reasonable determination of the facts in light of the evidence presented by the parties.  Chavis is therefore due no relief on those claims challenging his representation by only trial counsel at sentencing.  It is likewise clear that Chavis had no right to have trial counsel assist appellate counsel during the direct appeal proceedings.  Thus, the claim of ineffective assistance of appeal counsel alleging error in

his failure to secure assistance from trial counsel provides no basis for federal habeas relief.

With respect to the remaining claims of ineffective assistance of trial and appellate counsel, the appellate court found that Chavis failed to establish entitlement to relief on these claims. *Id*. at 6. ("Although the appellant did elaborate on these grounds in his brief to this court, his petition [filed with the trial court] contained nothing more than the allegations. The petition did not meet the burden of proof or specificity requirements of Rules 32.3 and 36.6(b), Ala.R.Crim., and those claims were properly dismissed by the trial court."). This court must therefore determine whether the rejection of Chavis' claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented...."). 28 U.S.C. § 2254(d)(1) and (2); *Allen v. Secretary, Florida Dept. of Corrections*, 611 F.3d 740, 745 (11th Cir. 2010); *Hammond v. Hall*, 586 F.3d 1289, 1306 (11th Cir. 2009).

Chavis alleges that trial counsel erred in failing to call the private investigator as a witness. The testimony Chavis sought to obtain from the private investigator constituted inadmissible hearsay, as the information sought from the investigator involved statements allegedly made to him by other individuals addressing the veracity of the victim and her

55

mother. This claim of ineffective assistance of trial counsel is therefore without merit. With respect to trial counsel's failure to seek more detailed factual accounts in the indictments, the indictments provided Chavis sufficient notice of the charges against him and did not deprive Chavis of any protected interest. *Infra* at 34, n.9. Thus, counsel's failure to challenge the indictments did not deprive Chavis of effective assistance. *Id.*

Chavis' challenges the trial court's instruction allowing consideration of the victim's age in determining forcible compulsion, and complains that the court failed to charge the jury on the lesser included offense of first degree sexual abuse. Chavis argues that trial counsel's failure to raise these claims constituted ineffective assistance. "[E]rrors in state jury instructions are federal constitutional issues only where they render the entire trial fundamentally unfair. *Jones v. Dugger*, 888 F.2d 1340, 1343 (11th Cir.1989)." *Erickson v. Secretary for the Dept. of Corrections*, 243 Fed. Appx. 524, 528 (11th Cir. 2007). After a thorough review of the record, including the testimony presented at trial and the jury instructions as a whole, the court finds that Chavis fails to demonstrate that the instruction on forcible compulsion and/or lack of an instruction on first degree sexual abuse rendered his trial fundamentally unfair. The jury instruction on forcible compulsion correctly sets forth state law on this element of the offense. *Rhodes v. State*, 651 So.2d 1122, 1124 (victim's age is appropriate factor to be weighed in determining whether defendant had used forcible compulsion against his 12-year old daughter); *Powe v. State*, 597 So.2d 721,

728 (Ala. 1991) (respective age of victim may be considered in determining forcible compulsion element of first degree rape perpetrated by father); *Lee v. State*, 586 So.2d 264, 266 (Ala.Cr.App. 1991) ("[I]n a case in which the victim is a child, questions involving resistance and force must be viewed in the framework of the child's age and point of view."). Moreover, it is clear that the jury instruction regarding forcible compulsion did not mislead the jury as to the State's burden of proof. The instruction given by the court clearly and correctly advised the jury that it could convict Chavis only if the State had proven his guilt on each element of the offense beyond a reasonable doubt. There is no "reasonable likelihood" that the jury understood the instruction to lower the required threshold of proof. *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 482 (1991); *Victor v. Nebraska*, 511 U.S. 1, 5-6, 114 S.Ct. 1239, 1243 (1994) ("The constitutional question ... is whether there is a reasonable likelihood that the jury understood the instruction to allow conviction based on [insufficient] proof...."). Thus, the challenged instruction did not deprive Chavis of any constitutional right and the failure of counsel to lodge an objection to the instruction cannot be considered ineffective assistance.

With respect to the lack of an instruction on a lesser included offense, Chavis has failed to demonstrate a violation of his constitutional rights. The victim testified that Chavis kissed her and touched her chest during the times he forced her to have sexual intercourse with him. *Respondents' Exhibit B (Part 1) - Doc. No. 35-2* at 62-63 (Trial

Transcript at 63-64). Chavis testified and adamantly denied any sexual contact with the victim. *Respondents' Exhibit B (Part 2) - Doc. No. 35-3* at 46, 53 (Trial Transcript at 161, 167). A state trial court's refusal to give a requested instruction does not, standing alone, warrant federal habeas corpus relief. The refusal to give the instruction must so infect the entire trial that the defendant was deprived of his right to a fair trial guaranteed by the Due Process Clause of the Fourteenth Amendment. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Cupp v. Naughten*, 414 U.S. 141, 147-148 (1973); *Erickson*, 243 Fed. Appx. at 528 (Alleged errors by a state court in issuing jury charges "are federal constitutional issues only where they render the entire trial fundamentally unfair."). There is nothing before this court to show that lack of a jury instruction on first degree sexual abuse deprived Chavis' of a fair trial. Thus, failure to seek a charge on the lesser offense did not deprive Chavis of any constitutional right as is necessary to establish ineffective assistance under *Strickland*. In addition, in light of all the evidence presented, including the testimony of Chavis, the action of trial counsel could be considered reasonable trial strategy. Consequently, Chavis has failed to meet his burden of establishing a constitutional violation arising from lack of the requested instruction or counsel's failure to request the charge.

Chavis asserts that counsel failed to call witnesses at the suppression hearing to support her argument that the tape recording of the controlled telephone call with the

victim should have been excluded from trial because Chavis had ingested heroin sometime prior to the conversation.  After listening to counsel's argument for suppression of the tape recording due to an alleged use of heroin by Chavis, the trial court noted that even assuming the use of heroin, the statements contained on the recording did not indicate that Chavis had been impaired by such use.  Specifically, the court reasoned that the mere use of an intoxicant "does not mean that [an individual] is so intoxicated that he cannot make a clear statement over the phone.  And that was a very clear statement [Chavis made] over the phone.  And it went into specific issues.  In my expert opinion, ... he was very clear in that statement.  There was no problem -- there was no pausing in answering the questions.  There was nothing there.  He was very clear.  He even launched out into issues about saying that someone else caused the pregnancy and wanted to make sure, you know, that [the victim] said that.  That shows an independent intellectual decision-making [process]." *Respondents' Exhibit B (Part 1) - Doc. No. 35-2* at 19-20 (Trial Transcript 20-21).  It is clear from the foregoing that counsel's failure to call witnesses to support the argument for suppression of the tape recording did not prejudice Chavis, as the trial court determined that even had Chavis ingested heroin prior to the telephone conversation, this fact, when viewed under the circumstances of the case, did not warrant suppression of the tape recording.

  In light of the foregoing, the court finds that the Alabama Court of Criminal Appeals

did not decide Chavis' claims of ineffective assistance of trial counsel "differently than [the Supreme] Court has [in a case based] on a set a of materially indistinguishable facts" nor did the state court apply a rule that contradicts governing federal law. *Williams*, 529 U.S. at 413, 120 S.Ct. at 1523. Consequently, the state appellate court's rejection of these claims was not contrary to actual Supreme Court decisions. Further, a thorough review of the evidentiary materials submitted in this case establishes that the state court's decision was objectively reasonable and likewise constituted a reasonable determination of the facts in light of the evidence presented by the parties. Thus, Chavis is not entitled to relief from this court on his claims of ineffective assistance of trial counsel.

Finally, Chavis maintains that the prosecution did not provide him with a report in the possession of an analyst employed by the Department of Forensic Sciences at the time of trial, and argues that appellate counsel provided ineffective assistance when he failed to cite any authority on direct appeal to support his claim that an agent of the State withheld exculpatory evidence from the defense. Specifically, Chavis asserts that appellate counsel should have cited *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963) in support of this claim.[11]

> In *Brady v. Maryland,* the Supreme Court placed an affirmative duty
> on the prosecution to reveal any "evidence [that] is material either to guilt or

---

[11] Although Chavis referenced *Brady* in his pleadings on appeal from the trial court's denial of his Rule 32 petition, a thorough review of the record establishes that he did not cite *Brady* in the petition filed with the trial court. *Respondents' Exhibit 12- Doc. No. 16-12* at 10-25.

to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196-97. This duty covers "[i]mpeachment evidence ... as well as exculpatory evidence." *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). The *Brady* rule applies to evidence possessed by the prosecution team, which includes both the investigators and prosecutors. *See United States v. Meros,* 866 F.2d 1304, 1309 (11th Cir.1989).

Three elements establish a *Brady* violation: (1) the evidence must be favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice. *See Kelley v. Sec'y for Dep't of Corrs.,* 377 F.3d 1317, 1354 (11th Cir.2004) (citing *Strickler v. Greene,* 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999)). *Brady* does not require that the prosecution "deliver [its] entire file to defense counsel, but only [that it] disclose" material evidence. *Bagley,* 473 U.S. at 675, 105 S.Ct. at 3380 (footnote omitted).

Evidence is prejudicially material only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1565-66, 131 L.Ed.2d 490 (1995). To meet this standard, "the defendant does not need to demonstrate that, after discounting the inculpatory evidence in light of the evidence in question, there would not have been enough evidence to convict him." *Taylor v. Singletary,* 122 F.3d 1390, 1395 (11th Cir.1997) (citation and quotation omitted). Instead, the defendant must show that the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*

*Stephens v. Hall*, 407 F.3d 1195, 1203 (11th Cir. 2005); *Sargent v. Secretary, Florida Dept.*

*Of Corrections*, 480 Appx. 523, 529 (11th Cir.), *cert. denied*, ___ U.S.___, 133 S.Ct. 585,

184 L.Ed.2d 384 (2012) ("The prosecution team is defined as 'the prosecutor or anyone over whom he has authority,' and includes 'both investigative and prosecutorial personnel.' *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002) (citation omitted).  But '[k]nowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor....'  *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoted in *Moon*, 285 F.3d at 1310).").

Chavis' challenge to a lack of disclosure is premised upon the presumption that an analyst or other employee of the Alabama Department of Forensic Sciences is a member of the prosecution team such that his/her knowledge may be imputed to the prosecutor for purposes of establishing a *Brady* violation.  Chavis cites no case decided by the United States Supreme Court which extends the prosecution team to include an employee of a state crime lab, nor has this court located any such case.  The Alabama Court of Criminal Appeals denied Chavis relief on this claim because he presented only a conclusory allegation of a constitutional violation and did not meet his burden of proof on this claim. *Respondents' Exhibit No. 14 - Doc. No. 16-14* at 6.  Under § 2254(d)(1) and binding case law, the state court's decision on this claim is due deference by this court.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision....  '[I]t is not an unreasonable application of clearly established Federal law for

a state court to decline to apply a specific legal rule that has not been squarely established by [the United States Supreme] Court.'" *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) (citations omitted). "Morever, a federal court may not overrule a state court ... when the precedent from [the Supreme] Court is, at best, ambiguous.' 'Until the Supreme Court has made a right concrete, it has not been clearly established.'" *Sargent*, 480 Fed.Appx. at 529 (citations omitted).

In *Sargent*, the Eleventh Circuit acknowledged that "[i]n no case has the Supreme Court defined 'representative of the State' to include a state crime-lab analyst." 480 Fed.Appx. at 529. It is therefore clear that "[b]ecause the Supreme Court has never addressed whether a toxicologist is a member of the prosecution's team, the state [appellate] court's decision that" appellate counsel did not provide ineffective assistance regarding presentation of this claim was not contrary to clearly established federal law as determined by the United States Supreme Court. *Id*. at 530. Moreover, under the circumstances of this case, it is likewise clear that the decision issued by the Alabama Court of Criminal Appeals was objectively reasonable. *Harrington*, ___ U.S. at ___, 131 S.Ct. at 786 (a state court does not act unreasonably when it refuses to apply a legal principle not clearly established by the United States Supreme Court). In addition, the decision issued by the Alabama Court of Criminal Appeals on this claim constituted a reasonable determination of the facts in light of the evidence presented by the parties.

Habeas relief is therefore unwarranted on the claim of ineffective assistance of appellate counsel.[12]

## III.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The petition for habeas corpus relief filed by Elmer Lamont Chavis be DENIED.

2.  This case be DISMISSED with prejudice.

It is further

ORDERED that on or before June 6, 2013 the parties may file objections to the Recommendation.   Objections   must   specifically   identify   the   findings   in   the Recommendation to which the party is objecting.   Frivolous, conclusive or general objections will not be considered by the District Court.   The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings in this Recommendation shall bar the party from a de novo determination by the District Court of issues covered in

---

[12]Based on the foregoing analysis and in light of the nature of the alleged suppressed evidence – i.e., lack of semen on bedding materials, a cloth, swabs taken from the victim and a pair of the victim's panties – it is likewise clear that no *Brady* violation occurred.  As previously determined, the Supreme Court has not established that an employee of a state forensics laboratory "is a member of the prosecution team such that her knowledge can be imputed to the state prosecutor...." *Sargent*, 480 Fed.Appx. at 530.  Consequently, Chavis has failed to establish that the prosecution team suppressed evidence within its possession, a required element of a *Brady* violation.  Furthermore, because lack of semen is wholly irrelevant to a prosecution for first degree rape, *Greathouse*, 650 So.2d at 603; *Smith*, 601 So.2d at 205, and the victim testified to multiple rapes occurring in the weeks prior to law enforcement officials' gaining possession of the items tested, the court finds that the evidence at issue was not prejudicially material, as Chavis has not demonstrated that the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Taylor v. Singletary*, 122 F.3d 1390, 1395 (11th Cir. 1997).

the Recommendation and shall bar the party from attacking on appeal factual findings in

the Recommendation accepted or adopted by the District Court except upon grounds of

plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see*

*Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982); *Bonner v. City of Prichard*,

661 F.2d 1206 (11th Cir. 1981, *en banc*) (adopting as binding precedent all decisions of the

 former Fifth Circuit handed down prior to September 30, 1981).

　　　　DONE, this 23rd  day of May, 2013.


　　　　　　　　　　　　　/s/ Susan Russ Walker
　　　　　　　　　　　　　SUSAN RUSS WALKER
　　　　　　　　　　　　　CHIEF UNITED STATES MAGISTRATE JUDGE

65